**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................ 3

    A.    Medical Guidelines for Treating Gender Dysphoria ..................................... 3

    B.    The Executive Orders ................................................................................ 5

    C.    The Impact of the Executive Orders on the Provision of Medical Care and Harm to Public Health ................................................................. 6

    D.    The Harm of the Executive Orders to the Individual Plaintiffs ................... 7

    E.    The Harm of the Executive Orders to the Members of PFLAG and GLMA ............................................................................................. 11

LEGAL STANDARD ..................................................................................... 13

ARGUMENT ................................................................................................... 14

I.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THEIR CLAIMS .......................................................................................... 14

    A.    Plaintiffs Have Standing .......................................................................... 14

    B.    The Executive Orders Are *Ultra Vires* Because They Exceed the President's Authority, Infringe Upon Congress's Powers, and Violate Article I's Framework for Federal Legislation ............................... 15

    C.    The Executive Orders Are *Ultra Vires* Because They Conflict with Laws that Prohibit Discrimination on the Basis of Sex ...................... 19

    D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim ........... 21

        1.    The Executive Orders Trigger Heightened Scrutiny ...................... 22

            a)    The Executive Orders classify on the basis of sex ............... 22

            b)    The Executive Orders classify based on transgender status ............................................................. 23

            c)    The Executive Orders were issued "because of," not "in spite of," their adverse effect on transgender people ........................................................... 24

        2.    The Executive Orders Cannot Survive Heightened Scrutiny ................................................................................... 26

         3.    The Executive Orders fail rational basis review.............................27

II.    THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING
       ORDER. ...................................................................................................28

       A.    The Executive Orders Already Are Causing Irreparable Harm. .................28

       B.    The Public Interest Overwhelmingly Favors Relief....................................29

       C.    A Nationwide Injunction Is Necessary. .....................................................29

CONCLUSION ..............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ..................................................................... 16, 19

*Air Evac EMS, Inc. v. McVey*,
    37 F.4th 89 (4th Cir. 2022) ........................................................................... 28

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
    509 F. Supp. 3d 482 (D. Md. 2020) ......................................................... 28, 29

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ..................................................................................... 19

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023) ......................................................... 26

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................................... 21

*City & Cnty. of S.F. v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...................................................................... 15

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) ........................................................................... 15, 16, 19

*Dekker v. Weida*,
    679 F. Supp. 3d 1271 (N.D. Fla. 2023) ................................................... 26, 27

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ..................................................................................... 14

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ........................................................................ 26

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *amended* (Aug. 28, 2020) ............................ 23

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...................................................... 13, 21, 29, 30, 30

*Hunt v. Wash. State Apple Advert Comm'n*,
    432 U.S. 333 (1977) ..................................................................................... 14

iv

*INS v. Chadha*,
   462 U.S. 919 (1983)..................................................................................... 16, 18, 19

*Int'l Refugee Assistance Proj. v. Trump*,
   857 F.3d 554 (4th Cir.) (en banc)................................................................ 27

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
   409 F. Supp. 3d 367 (D. Md. 2019) ............................................................ 13

*Kadel v. Folwell*,
   12 F.4th 422 (4th Cir. 2021)........................................................................ 26

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024).................................................................*passim*

*Koontz v. St. Johns River Water Mgt. Dist.*,
   570 U.S. 595 (2013)..................................................................................... 17

*Labrador v. Poe by & through Poe*,
   144 S. Ct. 921 (2024).................................................................................. 30

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) (en banc)....................................................... 28, 29

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011)....................................................................... 29

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..................................................................................... 28

*Nat'l Council of Nonprofits et al., v. OMB*,
   No. 25 Civ. 239, 2025 WL 368852 (D.D.C Feb. 3, 2025)....................... 2, 15, 28

*New York v. Trump*,
   No. 25 Civ. 39, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ................... 2, 15, 18, 28

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................... 13

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013)....................................................................... 28

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ........................................................................................ 17

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)................................................................................. 21, 24

*Planned Parenthood S. Atl. v. Baker,*
  941 F.3d 687 (4th Cir. 2019) ........................................................ 28

*Roe v. Dep't of Def.,*
  947 F.3d 207 (4th Cir. 2020) ........................................................ 29

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ........................................................ 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ........................................................ 20

*Train v. City of N.Y.,*
  420 U.S. 35 (1975) ........................................................ 16, 19

*Trump v. United States,*
  603 U.S. 593 (2024) ........................................................ 15

*United States v. Windsor,*
  570 U.S. 744 (2013) ........................................................ 21

*Van Garderen v. Montana,*
  No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023) ........................................................ 27

*Williams v. Kincaid,*
  45 F.4th 759 (4th Cir. 2022) ........................................................ 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ........................................................ 15, 16, 17

*Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ........................................................ 18

**Statutes**

2 U.S.C. §§ 683, 684 ........................................................ 16

5 U.S.C. § 7301 ........................................................ 16

42 U.S.C. § 300ff ........................................................ 18

42 U.S.C. § 300ff-1 ........................................................ 18

42 U.S.C. § 300ff-71(b)(4) ........................................................ 18

42 U.S.C. § 300w-7 ........................................................ 2, 19

42 U.S.C. § 18116 ........................................................ 2, 19

Further Consolidated Appropriations Act, Pub. L. No. 118-47..................................................... 17

**Executive Orders**

Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and
   Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025). ...................................................... 25

Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and
   Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615
   (Jan. 20, 2025).........................................................................................................*passim*

Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring
   Merit to Government Service*, Fed. Reg. 8621 (Jan. 20, 2025).............................................. 25

Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed.
   Reg. 8757 (Jan. 27, 2025)..................................................................................... 25

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical
   Mutilation,* 90 Fed. Reg. 8,771 (Jan. 28, 2025).......................................................*passim*

Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90
   Fed. Reg. 8853 (Jan. 29, 2025). ........................................................................... 25

**Constitutional Provisions**

U.S. Const. art. I § 7 ............................................................................... 16, 17, 18, 19

U.S. Const. art. I § 8 ............................................................................................... 16

## INTRODUCTION

Over the past week, hospitals across the country have abruptly halted medical care for transgender people under the age of nineteen, cancelling appointments and turning away some patients who have waited years to receive medically necessary care for gender dysphoria. This sudden shutdown in care is the direct and immediate result of Executive Order 14,187, issued by President Trump on January 28, 2025, directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care for people under nineteen (the "Denial of Care Order").[1] The Denial of Care Order followed on the heels of and built upon Executive Order 14,168, issued on January 20, 2025, commanding that "[f]ederal funds shall not be used to promote gender ideology," and directing all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" (the "Gender Identity Order").[2] The President has celebrated the shutdown in care as proof that the Orders are "already having [their] intended effect." Gonzalez-Pagan Decl., Ex. A-7.[3]

Plaintiffs are likely to succeed on the merits of their claims that these Orders are unlawful and unconstitutional. Under the Constitution, it is Congress, not the President, who is vested with the power of the purse. President Trump does not have unilateral power to withhold federal funds

---

[1] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Jan. 28, 2025).

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

[3] News Release, *President Trump is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/uncategorized/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/. Plaintiffs have filed an Index of Exhibits along with their motion identifying each declaration cited in this brief.

that Congress has authorized and signed into law, and he does not have the power to impose conditions on the use of funds when Congress has not delegated to him the power to do so.

President Trump also does not have the unilateral authority to direct and coerce agencies to take actions contrary to constitutional and statutory rights. Section 1557 of the Affordable Care Act ("ACA") and Section 1908 of the Public Health Service Act ("PHSA") prohibit healthcare entities from discriminating based on sex as a condition of receiving federal funding. *See* 42 U.S.C. § 18116(a); 42 U.S.C. § 300w-7(a)(2). President Trump cannot override these statutes and require federal grantees to engage in precisely the discrimination that Congress has prohibited. Nor does he have the authority to violate the equal protection rights of thousands of transgender people under nineteen, including the Transgender Plaintiffs,[4] by depriving them of necessary medical care solely on the basis of their sex and transgender status.

The Orders gravely threaten transgender people in the United States by pitting the health and wellbeing of that vulnerable minority population against the health and wellbeing of countless others and millions of dollars in federal funding. They have caused—and will continue to cause— severe and irreparable harm if this Court does not issue a Temporary Restraining Order enjoining the Agency Defendants from implementing and enforcing Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order.

Other Federal courts have issued TROs against similar attempts by the Trump Administration to unlawfully withhold federal funds. *See New York v. Trump*, No. 25 Civ. 39, 2025 WL 357368, *2-3 (D.R.I. Jan. 31, 2025) (issuing TRO against OMB directive to withhold federal funds); *Nat'l Council of Nonprofits v. OMB*, No. 25 Civ. 239, 2025 WL 368852, at *14

---

[4] The Transgender Plaintiffs are Plaintiffs Gabe Goe, Bella Boe, Cameron Coe, Robert Roe, and W.G. (the "Minor Plaintiffs"), Plaintiffs Lawrence Loe and Dylan Doe (the "Adult Plaintiffs"), and certain PFLAG members under age nineteen who are also transgender.

(D.D.C. Feb. 3, 2025) (same).  The same principles require a TRO here.[5]

## STATEMENT OF FACTS

### A.     Medical Guidelines for Treating Gender Dysphoria

Everyone, including transgender and gender diverse young people, deserves access to respectful, compassionate, and evidence-based care.  Gender affirming medical care improves the health, wellbeing, and quality of life of transgender people with gender dysphoria.  Sheldon Decl. ¶ 22.  And prohibiting access to this evidence-based and effective medical care leads to negative health outcomes.  *Id.*  By threatening to take away all federal grant funding from an institution because it provides gender affirming medical care—even when the grants being taken away are not related to that care—the Orders attempt to deprive transgender young people across the United States of critical—and often lifesaving—medical services, leading to potentially severe health consequences.  *Id.*; Birnbaum Decl. ¶ 14.

Doctors in hospitals and other medical facilities that receive federal funding follow evidence-based, well-researched, and widely accepted clinical practice and medical guidelines to assess, diagnose, and treat adolescents and adults with gender dysphoria, which is a medical condition characterized by the clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth.  Sheldon Decl. ¶¶ 13, 25, 28.

Decades of clinical experience and a large body of scientific and medical literature support these medical guidelines, which are recognized as authoritative by the major medical associations in the United States.  *Id.* ¶ 25.  These guidelines provide a framework for the safe and effective treatment of gender dysphoria, which, if left untreated, can have serious consequences for the

---

[5] The TROs issued against the OMB directive do not lessen the need for TRO relief here.  The nationwide shutdown of gender affirming medical care was precipitated by the Denial of Care Order, not the OMB directive.  And on February 3, 2025, the government argued that they did not construe those TROs to enjoin the "President's Executive Orders."  Dkt. 51, *New York v. Trump*, No. 25 Civ. 39 (D.R.I.).

health and wellbeing of transgender people with gender dysphoria, including adolescents. *Id*. ¶¶ 17, 29. Medically indicated treatments for some adolescents may include puberty-delaying treatment and hormone therapy. *See id.* ¶ 17.

For many transgender adolescents, the onset of puberty leading to physical changes in their bodies that are incongruent with their gender identities can cause extreme distress. Bond Decl. ¶¶ 15, 18; Boe Decl. ¶ 18; Coe Decl. ¶ 18; Chapman Decl. ¶¶ 10, 36. Puberty-delaying medication allows transgender adolescents to pause these changes, minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity. Compl. ¶ 47. Without puberty-delaying medication, an adolescent's body will undergo changes that may be difficult or impossible to later reverse. *Id*.

For some older adolescents and adults, it may be medically necessary and appropriate to treat them with gender affirming hormone therapy (*e.g.*, testosterone for transgender boys and estrogen and testosterone suppression for transgender girls). *Id*. ¶ 49. Treatment is initiated for minors only with parental consent. *Id*. ¶ 51.

The same treatments used to treat gender dysphoria are also used to treat other conditions in adolescents and adults. *Id*. ¶ 56. For example, puberty-delaying medication is used to treat children with central precocious puberty and to treat adolescents and adults with hormone-sensitive cancers and endometriosis. *Id*. For delayed puberty, non-transgender boys are prescribed testosterone, and non-transgender girls are prescribed estrogen. *Id*. Testosterone suppression is used in non-transgender girls with Polycystic Ovarian Syndrome. *Id*.

The potential risks associated with these interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children, and for which otherwise competent adults can consent

4

on their own.  *Id.* ¶ 57.

### B.    The Executive Orders

President Trump issued the Gender Identity Order on January 20, 2025.  Section 3(g) of the Order declares: "Federal funds shall not be used to promote gender ideology."  President Trump further directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds to do not promote gender ideology."  *Id.*  The Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."  *Id.* § 2(f).  It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."  *Id.*

On January 28, 2025, President Trump issued the Denial of Care Order, which builds on the Gender Identity Order.  Section 4 of the Denial of Care Order directs the immediate defunding of medical institutions that provide gender affirming medical care to patients under age nineteen for the purpose of gender transition.  Denial of Care Order § 4.  The Orders do not seek to prohibit federal funding to entities that provide these same treatments for other medical conditions; rather, they prohibit federal funding to entities only when the medical care is for the purpose of gender transition—that is, to align a patient's gender presentation with an identity different from their sex assigned at birth.  *Id.* §§ 2(c), 4.  Importantly, the Orders are not limited to grants used for or related to gender affirming medical care.  Rather, President Trump has unilaterally directed that *all* federal medical and research grants be stopped, regardless of whether the funds are used for or related to gender affirming medical care in any way.  *Id.*

The Orders are part of a systematic effort that the Trump Administration has launched to

target what it terms "gender ideology" and transgender people. In his first nine full days in office, President Trump has signed nine Executive Orders targeting transgender people—a rate of approximately one per day. Compl. ¶¶ 72-76.

### C. The Impact of the Executive Orders on the Provision of Medical Care and Harm to Public Health

The Denial of Care and Gender Identity Orders have had direct and immediate effects on the provision of medical care to transgender people under nineteen. *Id*. ¶¶ 77-98; Goe Decl. ¶¶ 13-17; Boe Decl. ¶¶ 13-20; Coe Decl. ¶¶ 16-19; Roe Decl. ¶¶ 10-16; Chapman Decl. ¶¶ 31-34; Loe Decl. ¶¶ 11-14; Doe Decl. ¶¶ 11-15; Bond Decl. ¶ 14; Sheldon Decl. ¶ 29; Birnbaum Decl. ¶¶ 13-15. Medical institutions across the United States that receive federal funding have stopped providing gender affirming medical care for patients younger than nineteen because of the Orders. Compl. ¶¶ 82-96; Sheldon Decl. ¶ 21. Hospitals and other healthcare institutions fear that if they do not stop providing gender affirming medical care to their transgender patients, they will immediately lose significant federal funding for research, medical education, and healthcare, including research and care unrelated to the provision of treatment of gender dysphoria. Compl. ¶¶ 79, 95; Sheldon Decl. ¶ 24. Citing to the Denial of Care and Gender Identity Orders, Defendant Health Services Resource Administration ("HRSA") has already issued notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." Compl. ¶ 80; *see* Gonzalez-Pagan Decl. Ex. A-1. Medical institutions that have been forced to stop providing gender affirming medical care to patients under nineteen include Children's National in Washington, D.C.; Virginia Commonwealth University ("VCU") Health, Children's Hospital of Richmond, and UVA Health in Virginia; NYU Langone Health in New York; Boston Children's Hospital in Massachusetts; and Denver Health in Colorado. Compl.

¶¶ 83-95; *see* Gonzalez-Pagan Decl. Exs. A-2–A-6. And again, President Trump has touted these shutdowns as proof that the Orders are "already having [their] intended effect." *See* Gonzalez-Pagan Decl. Ex. A-7.

### D.    The Harm of the Executive Orders to the Individual Plaintiffs

Plaintiff Gabe Goe is a 14-year-old transgender adolescent living in Maryland. Goe Decl. ¶ 2. For years, Gabe and his parents have worked with medical providers at Children's National, including an endocrinologist and psychologist, to treat his gender dysphoria. *Id.* ¶¶ 10-11. But on January 30, 2025, Gabe was told that Children's National would no longer issue new prescriptions or processing refills on existing prescriptions for gender affirming medical care for transgender people under nineteen, disrupting the careful medical planning of his doctors. *Id.* ¶¶ 12, 14, 17. Without appropriate medical care for his diagnosed gender dysphoria to align his developing body with his gender identity, Gabe will continue to experience distress and dysphoria.. *Id.* ¶ 8. His father, George, is heartbroken for his son. *Id.* ¶ 15. The rest of Gabe's family is devastated and worried that the Denial of Care Order is the first step in enabling further discrimination against their son. *Id.*

Plaintiff Bella Boe is a 12-year-old transgender adolescent living in New York who has been diagnosed with gender dysphoria. Boe Decl. ¶¶ 3, 11. After careful planning with her parents and her medical providers at NYU Langone Health's Transgender Youth Health Program, Bella was supposed to be scheduled in late January to receive a puberty-delaying implant to prevent irreversible physical changes from undergoing a puberty inconsistent with her gender identity. *Id.* ¶¶ 10-11. Bella has already started puberty, and she is fearful and scared about her body changing permanently during a male puberty: developing facial or body hair will make Bella feel different, isolated, and not like herself. *Id.* ¶¶ 17-18. But after President Trump signed the Denial of Care Order, NYU told Bella's father Bruce that it had shut down all appointments related to gender

affirming medical care, including Bella's future appointment to receive her implant.  *Id.* ¶¶ 13-15. Because of the Orders, Bella's family is scared they have no way of getting Bella the care that she requires, and that she will return to being depressed.  *Id.* ¶¶ 19-20.

Cameron Coe is a 12-year-old living in New York.  Coe Decl. ¶ 3.  Cameron is nonbinary and has received a diagnosis of gender dysphoria because of the distress caused by the incongruence between their gender identity and their birth-designated sex.  *Id.* ¶¶ 5, 9.  Once they began puberty, Cameron became increasingly uncomfortable in their body, causing more acute stress and anxiety.  *Id.* ¶¶ 10-11.  Cameron's medical providers, parents, and Cameron determined that Cameron should begin receiving puberty-suppressing medication.  *Id.* ¶ 12.  Cameron experienced enormous relief after their first injection, which positively influenced their relationships, including with other students and teachers at school.  *Id.* ¶ 13.  Cameron had an appointment scheduled to receive a puberty-blocking implant at NYU Langone Health on January 31, 2025.  *Id.* ¶ 15.  But on January 29, 2025, Cameron's family received a call from NYU informing them that the appointment was canceled.  *Id.* ¶ 17.  Cameron's anxiety has increased greatly because of the fear of not being able to continue puberty-blocking medication.  *Id.* ¶ 18. This has had negative physical consequences, including stomach pains and insomnia.  *Id.* Cameron's parents are worried about immediate severe distress and suicidality if Cameron remains unable to receive necessary gender affirming medical care.  *Id.*  Cameron's mother Claire wants only for her child to feel safe and loved, and she believes that her job as a parent is to protect her child.  *Id.* ¶ 19.  The Denial of Care Order prevents Claire and Cameron's father from doing that.  *Id.*

Plaintiff Robert Roe is a 16-year-old transgender adolescent living in Massachusetts.  Roe Decl. ¶ 3.  He has been receiving medical care from the Gender Multispecialty Service (GeMS) at

Boston Children's Hospital for several years. *Id.* ¶ 8. Robert received a puberty-blocking implant at age 11 and started receiving hormone therapy at age 14. *Id.* Robert had a check-up appointment for his hormone therapy at GeMS scheduled for January 29, 2025. *Id.* ¶ 11. That morning, a nurse practitioner at GeMS told Robert's mother Rachel that because of the Denial of Care Order, GeMS was cancelling all of its appointments for gender affirming medical care for people under the age of nineteen. *Id.* ¶ 12. Rachel is scared that Robert, who had never undergone an endogenous female puberty because of puberty blockers, will experience significant distress and anxiety. *Id.* ¶ 13. Robert needs testosterone to live his life; most people do not know he is transgender, and he wants to keep that choice. *Id.* ¶¶ 9, 13. Robert's family does not know how to get him access to the care he needs. They are fearful of what will happen to Robert's confidence and happiness if he is denied gender affirming medical care. *Id.* ¶¶ 15-16.

Plaintiff W.G. is a 17-year-old transgender adolescent living in Virginia. Chapman Decl. ¶ 4. W.G. goes by the name Willow. Willow has been diagnosed with gender dysphoria. *Id.* ¶ 17. She began taking puberty blockers when she was 13. *Id.* ¶ 19. In March 2023, Willow and her family were living in Tennessee when the state enacted a ban on gender affirming medical care for transgender minors, quashing Willow's family's hopes of Willow starting estrogen in December 2023. *Id.* ¶¶ 21-22, 30. In June 2023, Vanderbilt University Medical Center informed patients that the previous November, at the Tennessee Attorney General's request, it had shared non-anonymized patient records from the Pediatric Transgender Clinic with the government. *Id.* ¶ 25. After they spoke out against the Tennessee law, the family received death threats. *Id.* ¶ 26. Fearing for their safety and Willow's access to care, the family moved from Tennessee to Virginia. *Id.* ¶¶ 26-27. Searching for doctors that were not cost-prohibitive was difficult, given that Willow and her family rely on Medicaid. *Id.* ¶¶ 7, 28-29. Ultimately, Willow's family was able to schedule

an appointment with the Children's Hospital of Richmond for January 29, 2025 so that Willow could continue hormone treatment. *Id.* ¶ 30. A few hours before the appointment, however, a member of the VCU staff told Willow's mother Kristen that, due to the Denial of Care Order, VCU would no longer be able to provide Willow's necessary medical treatment. *Id.* ¶ 32. Willow's family is unsure how Willow will be able to secure her treatment. *Id.* ¶ 36.

Plaintiff Lawrence Loe is an 18-year-old transgender young man living in New York. Loe Decl. ¶ 2. Lawrence started taking medication to suppress menstruation and manage his gender dysphoria when he was 13, and he began taking testosterone when he was 16. *Id.* ¶ 6. After waiting to have chest masculinization surgery until he was 18, Lawrence and his medical providers scheduled his surgery was planned for the first week of February at NYU Langone. *Id.* ¶ 8. On January 29, 2025, Lawrence received a call from a nurse practitioner who told him that, because of the Denial of Care Order, NYU was cancelling his surgery appointment. *Id.* ¶ 12. They said Lawrence could not schedule the surgery until after he turned nineteen. *Id.* Lawrence is devastated that the necessary medical care he has been working toward for so long was pulled away from him, especially now that he is an adult. *Id.* ¶¶ 13-14. Flattening his chest is physically painful and hard on his skin, and this delay in treatment exacerbates that harm. *Id.* ¶ 10.

Plaintiff Dylan Doe is an 18-year-old transgender young man living in Massachusetts. Doe Decl. ¶¶ 2, 4, 7. He has been receiving testosterone as treatment for gender dysphoria since he was 14. *Id.* ¶ 6. He goes to the doctor every four months to receive testosterone. *Id.* ¶ 10. Dylan had one of these appointments scheduled for January 31, 2025, but on January 30, 2025, a provider from the clinic told Dylan that due to the Denial of Care Order, his appointment was cancelled and would need to be postponed. *Id.* ¶¶ 12, 13. Gender affirming medical care has been an essential part of Dylan's quality of life. *Id.* ¶ 15. When Dylan thinks about losing it, he becomes too

depressed to function. *Id.* He is worried about what will happen to him if his does not receive medical care for an entire year and he is anxious about the prospect of needing to leave the country to continue receiving the medical care he needs. *Id.* ¶¶ 15, 17.

      **E.    The Harm of the Executive Orders to the Members of PFLAG and GLMA**

      Plaintiff PFLAG is the largest national organization dedicated to supporting, educating, and advocating for LGBTQ+ people, and their parents and families, and allies. Bond Decl. ¶¶ 3-4. In addition to the individual plaintiffs in this case, who are all PFLAG members, PFLAG has many other members whose children are being monitored for the appropriate time to begin puberty blockers and/or hormone therapy as part of a medically prescribed course of care for gender dysphoria. *Id.* ¶ 14. Since the Denial of Care Order was issued, PFLAG has heard from members across the country about their adolescents' appointments for gender affirming medical care being cancelled, putting those children at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place. *Id.*

      Plaintiff GLMA is a non-profit membership organization whose mission is to ensure health equity for LGBTQ+ individuals and equality for LGBTQ+ medical providers in their working and learning environments. Sheldon Decl. ¶¶ 6, 8, 15. Since the Denial of Care Order was issued, GLMA's members and their patients have been immediately negatively affected. *Id.* ¶ 22. Many GLMA members are employed by medical institutions that receive federal grants, including some medical provider members that provide medically necessary gender affirming medical care to patients under nineteen. *Id.* ¶ 24.

      One of GLMA's members is Kyle Koe, a clinician-researcher at Boston Medical Center specializing in sexual and gender minority health who depends on grant funding, including NIH funding. Koe Decl. ¶¶ 3-5. BMC also is the recipient of millions of dollars in federal grants, including from the NIH, HRSA, Centers for Disease Control and Prevention ("CDC"), and Agency

for Healthcare Research and Quality ("AHRQ"), among others. *Id.* ¶ 6. The vast majority of these grants do not relate to the provision of medical interventions for the treatment of gender dysphoria. *Id.* Kyle also is as a medical provider who treats both cisgender and transgender patients. *Id.* ¶ 8. Gender dysphoria is among the conditions he treats. *Id.* When treating gender dysphoria, like other healthcare providers, he uses the same medications to treat transgender people as he uses to treat cisgender people with hormone deficiencies. *Id.* ¶ 9.

Because the Orders mandate that all federal funding be stripped from a medical institution if it continues to provide gender affirming medical care—even when the funding is not related to that care—the Orders have placed Kyle and many other clinician-researchers and medical institutions in an untenable position. They force physicians, like Kyle, and hospitals to make an impossible choice between denying care to a vulnerable minority community or not being to provide care to anyone at all. Koe Decl. ¶¶ 11-13.

Another of GLMA's members is Dr. Jeffrey Birnbaum, an Associate Professor of Pediatrics at SUNY Downstate Health Sciences University ("SUNY Downstate") and an adolescent medicine specialist and board-certified pediatrician. Birnbaum Decl. ¶¶ 3, 5. He is also the Director of Health & Education Alternatives for Teens ("HEAT") based at University Hospital at Downstate. *Id.* He is both a clinician and researcher whose work focuses on caring for teens and young adults living with HIV and providing gender affirming medical care, including pubertal suppression or hormone therapy when medically indicated for the given patient. *Id.* ¶¶ 3, 10. Dr. Birnbaum's research and clinical work, including the primary medical care he provides to HIV+ youth, depend on federal grants, including from Defendants NIH and HRSA. *Id.* ¶¶ 6-7. More broadly, both SUNY Downstate and University Hospital receive millions of dollars in federal grants, including from NIH and HRSA—the vast majority of which have nothing to do

with medical interventions for the treatment of gender dysphoria. *Id.* ¶ 8. The Orders threaten Dr. Birnbaum's ability to do his work and deliver the critical medical care he provides to underserved young people daily. *Id.* ¶¶ 13-14. Dr. Birnbaum is worried and confused about how to navigate his legal and professional obligations to provide medically necessary treatment to his patients free from discrimination. *Id.* ¶ 14.

One of the guiding ethics of medicine is to treat all patients equally. Sheldon Decl. ¶ 27. To not permit—indeed, to actively forbid—a provider to make individualized assessments of the medical needs of all patients, harms patients by preventing them from accessing needed care even at trusted facilities and practices. *Id.* The Orders are causing precisely this harm. *Id.* ¶ 29. Patients and parents are calling GLMA members in tears and expressing extreme distress. *Id.* GLMA members at institutions that have suspended care are receiving calls from their patients who are experiencing significant distress and even suicidality. *Id.* And even at institutions that are providing care, the widespread fear has led many patients to express feelings of extreme distress and even suicidality as a result of fear of discontinued care. *Id.*

## LEGAL STANDARD

The substantive requirements for a TRO and a preliminary injunction are identical. *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019). The moving party must show: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.    **PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THEIR CLAIMS.**

### A.    Plaintiffs Have Standing.

"To have standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (internal quotation marks omitted).   Here, the Transgender Plaintiffs who have been denied gender affirming medical care have suffered an injury in fact, and their injuries flow from "the predictable effect of [the Orders] on the decisions of third parties." *Id.* at 768.   Indeed, President Trump agrees that the hospitals' shutdowns of gender affirming medical care are the Orders' "intended effect." *See* Gonzalez-Pagan Decl. Ex. A-7.

PFLAG and GLMA have associational standing because (a) they have members with standing to sue in their own right, (b) their members' interests are germane to the organizations missions, and (c) the members' participation is not necessary to adjudicate their claims or grant relief. *See Hunt v. Wash. State Apple Advert Comm'n*, 432 U.S. 333, 343 (1977).   PFLAG has associational standing to sue on behalf of its members who themselves or whose children have lost gender affirming medical care, including the Individual Plaintiffs in this case.   And GLMA has associational standing to assert claims on behalf of its members, including the two GLMA members who have submitted declarations establishing "concrete, particularized, and actual or imminent" injuries from the threatened loss of funds. *Dep't of Com.*, 588 U.S. at 766.   *See* Sheldon Decl. ¶¶ 24, 30; Koe Decl. ¶ 13; Birnbaum Decl. ¶ 14.   As discussed above, HRSA has already begun issuing notices stating that grants have been terminated.   *See* Gonzalez-Pagan Decl. Ex. A-1.   In light of the clear and categorical text of the Orders, the GLMA declarants need not to wait

14

to receive a similar notice before seeking relief. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1236-37 (9th Cir. 2018) (finding standing where policies of grant recipients were in conflict with executive order).

> **B.    The Executive Orders Are *Ultra Vires* Because They Exceed the President's Authority, Infringe Upon Congress's Powers, and Violate Article I's Framework for Federal Legislation.**

Congress authorizes and allocates funds for federal grants in the annual appropriations bill or by federal statute. Federal grants are federal law, and conditioning or cancelling federal grants amounts to amending or repealing federal law. *Clinton v. City of N.Y.*, 524 U.S. 417, 444 (1998) (cancellations "are the functional equivalent of partial repeals of Acts of Congress"). The Executive Branch has no constitutional or statutory authority to amend or repeal federal laws.

The President nevertheless attempts to do so. Section 4 of the Denial of Care Order directs agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" the provision of gender affirming medical care. Similarly, Section 3(g) of the Gender Identity Order directs agencies to ensure federal grant recipients "do not promote gender ideology," which it defines as including the recognition that a person can have a gender identity "disconnected from one's sex." Gender Identity Order §§ 2(f), 3(g).

These commands run roughshod over the Constitution and its carefully designed separation of powers. In the rush to advance the President's policy interests, the Denial of Care and Gender Identity Orders exceed the bounds of Article II, infringe upon Congress's authority under Article I to control the public fisc, and violate Article I's Bicameralism and Presentment Clauses. *See New York v. Trump*, 2025 WL 357368, at *2-3 (issuing TRO against OMB directive to withhold federal funds); *Nat'l Council of Nonprofits*, 2025 WL 368852, at *14 (same).

"No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024)

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  Because the Denial of Care Order does not identify a statute authorizing the Executive Branch to broadly amend or terminate federal grants,[6] Article II must provide this authority.

Article II does not.  Federal grants are part of federal law, as they are enacted pursuant to federal statutes and appropriation bills.  Modifying or terminating those grants amounts to modifying or repealing the statutes authorizing them.  Nothing in Article II "authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438; *INS v. Chadha*, 462 U.S. 919, 954 (1983).  That power lies with Congress.  *See* U.S. CONST. art. I, § 7 (providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"); *id.* art. I, § 8, cl. 1 (Congress, not the Executive, has the power to use funds for the "general Welfare of the United States").

Nor does the Constitution or any statute vest the President with a general impoundment power.  Quite the opposite.  *See* 2 U.S.C. §§ 683, 684 (Impoundment Control Act, prohibiting the President or federal agencies from impounding lawfully appropriated funds).  Courts thus have regularly rejected arguments that the President may refuse to disperse federal funds on a whim. *See Clinton*, 524 U.S. at 442 (President may not "decline to spend" appropriated sums or "decline to implement" spending statutes); *cf. Train v. City of N.Y.*, 420 U.S. 35, 38 (1975).  As then-Judge Kavanaugh explained, even when the President has "policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program," he lacks "unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

---

[6] The only statutory authority the Gender Identity Order identifies pertains to "regulations for the conduct of employees in the executive branch."  Gender Identity Order, Preamble (citing 5 U.S.C. § 7301).

The Orders attempt to do exactly that: They do "not direct that a congressional policy be executed in a manner prescribed by Congress" but instead direct "that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. But "the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* at 587. That power belongs to Congress.

The Executive's unilateral attempt to terminate federal grants also infringes on Congress's authority to promulgate law and control public monies. *See* U.S. CONST. art. I, § 7, cl. 2, 3. With some limitations not applicable here, Congress may condition how public funds are spent. *See generally South Dakota v. Dole*, 483 U.S. 203 (1987); *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595 (2013). Congress explicitly provides these conditions in the statutes or appropriations bills authorizing federal grants.

The Orders purport to usurp Congress's authority by conditioning federal grants on grantees' immediate agreement to "end" gender affirming medical care and not to promote "gender ideology." Denial of Care Order § 4; Gender Identity Order § 3(g). But the Constitution vests Congress, not the Executive, with authority over the public fisc, and Congress has imposed *no* conditions on federal grants regarding gender affirming medical care. When Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981). *See*, *e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 526 (2024) (prohibiting grant funds from being used to provide sterile needles); *id.* § 202 (prohibiting grant funds from being used to pay salaries above specified rates).

The Denial of Care Order also expressly subordinates Congress's purpose to the President's preferences. Take the Ryan White HIV/AIDS Program, dispensed by HRSA. The

Ryan White Program is designed to provide assistance to communities disproportionately affected by the Human Immunodeficiency Virus (HIV) by offering grants to advance HIV/AIDS clinical research, among other things. *See* 42 U.S.C. § 300ff; 42 U.S.C. § 300ff-71(b)(4). Congress placed one condition on these grants: the funds may not be used to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs." 42 U.S.C. § 300ff-1.

The Denial of Care Order strips grantees, including Dr. Birnbaum, of their Ryan White Program funding if they also provide evidence-based gender affirming medical care. *See* Birnbaum Decl. ¶¶ 7, 10, 14. Because the Order applies even to grantees who comply with the conditions attached to their funding and utilize their funds to effectuate the program's purposes, it is "incompatible with the expressed or implied will of Congress." *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York v. Trump*, 2025 WL 357368, at *2 (emphasis omitted). The Orders instead force Presidential policy upon federal legislation and unconstitutionally intrude upon the Congressional prerogative to control the public fisc.

Finally, the Orders not only usurp Congressional powers, but bypass the Legislative branch altogether to sidestep Article I's framework for passing laws. "Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process." *Chadha*, 462 U.S. at 945. Article I requires that every bill pass in both the House of Representatives and the Senate before it is presented to the President. U.S. CONST. art. I, § 7, cl. 2. If the President vetoes the bill, Congress may override his veto by vote of two thirds of the Senate and the House. *Id.* art. I, § 7, cl. 3. These procedural "steps" are non-negotiable: they were designed "to erect enduring checks on each Branch and to protect the

18

people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 951, 957.

Federal grants are part and parcel of federal law.  Imposing additional terms to, or terminating, a grant is equivalent to amending or repealing a federal statute.  "Amendment and repeal of statutes, no less than enactment, must conform with Art. I." *Id.* at 954.  Article I requires that all bills pass both houses of Congress before being signed into law by the President.  U.S. CONST. art. I, § 7, cl. 2, 3.  If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken*, 725 F.3d at 261 n.1 (Kavanaugh, J.); *see also* U.S. CONST. art. I, § 7, cl. 2.  Article I does not allow the President to circumvent Bicameralism and Presentment by unilaterally amending or canceling federal appropriations via executive order.  *See Clinton,* 524 U.S. at 448; *Train*, 420 U.S. at 38.  Because the Orders did not abide by the "single, finely wrought and exhaustively considered, procedure" for amending or repealing federal legislation, they are unlawful.  *Chadha*, 462 U.S. at 951.

### C.    The Executive Orders Are *Ultra Vires* Because They Conflict with Laws that Prohibit Discrimination on the Basis of Sex.

The Executive Orders also are *ultra vires* because they impermissibly direct agencies to act in contravention of Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, which prohibit health care entities receiving federal financial assistance from discriminating against individuals on the basis of sex.

In *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), the Supreme Court held that discrimination "because of . . . sex" under Title VII includes discrimination based on transgender status.  And in *Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) ("*Kadel II*"), the Fourth Circuit, sitting *en banc*, held that *Bostock*'s reasoning applies to "discrimination on the basis of sex" under

19

Section 1557.  The same reasoning also applies to discrimination "on the ground of sex" under the PHSA.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring) (explaining that discrimination "on the ground of" a characteristic under Title VI should be interpreted consistently with *Bostock*).

*Kadel II* makes clear that a healthcare entity discriminates based on sex when it refuses to provide medical care based solely on the fact that the care is for the purpose of gender transition. Allowing or disallowing treatment based on whether the treatment aligns with a person's sex assigned at birth "is textbook sex discrimination" under *Bostock*, and thus under Section 1557 of the ACA and Section 1908 of the PHSA.  *Kadel II*, 100 F.4th at 153, 164.  First, determining whether medical care is prohibited by the Orders "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Id.* at 147.  They "cannot function without relying on direct … discrimination" based on sex.  *Id.* at 146.  "Second, a policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes."  *Id.* at 154.

Fourth Circuit precedent thus establishes that Section 1557 of the ACA and Section 1908 of the PHSA prohibit medical institutions and healthcare providers that receive federal grants from discriminating based on sex as a condition of receiving federal financial assistance.  Yet, the Orders attempt to nullify these statutory nondiscrimination laws by directing grant recipients to do the opposite.  The Orders direct agencies to withhold grants from healthcare entities unless they deny medical services to patients under nineteen for the purpose of gender transition, despite providing the same services to other patients.  This is sex discrimination.  *Kadel II*, 100 F.4th at 153.

President Trump does not have the power to "override[]" Section 1557 of the ACA and

Section 1908 of the PHSA by requiring federal grantees to engage in precisely the discrimination that these statutes prohibit. *See HIAS*, 985 F.3d at 322 (affirming preliminary injunction against executive order that conflicted with the Refugee Act); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) (enjoining executive order as inconsistent with the National Labor Relations Act and explaining that courts can enjoin an executive order when it "transgresses or causes a contractor to violate a prohibition of another statute"). Because the Orders impermissibly direct agencies to act in violation of statutory laws that prohibit discrimination on the basis of sex by federal grantees, they are *ultra vires* and the Agency Defendants must be enjoined from implementing or enforcing them.

> **D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order flagrantly violate Transgender Plaintiffs' right to equal protection under the laws. *See* U.S. Const. amends. V, XIV; *United States v. Windsor*, 570 U.S. 744, 774 (2013). The Fourth Circuit's decision in *Kadel II* establishes that laws or policies prohibiting gender affirming medical care classify based on sex and transgender status, and thus trigger heightened equal-protection scrutiny. *See* 100 F.4th at 143. Under that binding precedent, the Orders must be subjected to heightened scrutiny because they (a) facially classify on the basis of sex and transgender status and (b) the text of the Orders makes clear they were issued, at least in part, "because of," not "in spite of," the Trump administration's ideological opposition to transgender people and gender transition. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). And because the Orders cannot possibly survive any level of scrutiny—much less heightened scrutiny—Plaintiffs are likely to succeed on their Equal Protection claim.

1.      **The Executive Orders Trigger Heightened Scrutiny.**

a)      **The Executive Orders classify on the basis of sex.**

The Executive Orders prohibit recipients of federal funds from providing necessary medical care to adolescent patients only if the purpose of the care is "to align [their] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). But the Orders permit the exact same care if it is performed for other purposes. This distinction "is textbook sex discrimination." *Kadel II*, 100 F.4th at 153.

In fact, the sex classification in the Orders is even more obvious than in *Kadel*. In *Kadel II*, the exclusion barred coverage for "[t]reatment or studies leading to or in connection with sex changes or modifications and related care." *Id.* at 135. Here, the Orders spell out the discrimination even more plainly: recipients of federal funds may not provide care that "align[s] [a patient's] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). To know whether a federal fund recipient may continue to provide a given type of care—say, testosterone to a patient—one must know "his or her sex," *i.e.*, whether the patient was designated "male" or "female" at birth and deny care on that basis. The Orders do not prohibit federal fund recipients from providing testosterone to an adolescent who identifies as a boy to align his physical appearance with his male identity if the adolescent was assigned male at birth. But if an adolescent's sex assigned at birth was female, the Orders would prohibit federal fund recipients from providing the same treatment because it seeks to "align [his] physical appearance with an identity that differs from his or her sex." *Id*.

The Orders also classify based on sex by explicitly enforcing sex stereotypes and gender conformity. They prohibit medical care intended to "to align an individual's physical appearance with an identity that *differs from his or her sex*." *Id.* (emphasis added); *see also* Gender Identity

Order § 2(f) (defining "gender ideology" as having a gender identity "disconnected from one's sex."). As *Kadel II* explained, "a policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes." 100 F.4th at 154.

Because they impose disparate treatment based on sex designated at birth and enforce state-imposed sex stereotypes, the Orders facially classify based on sex, triggering heightened scrutiny.

**b)**  **The Executive Orders classify based on transgender status.**

The Executive Orders trigger heightened scrutiny for a second and independent reason: they classify based on transgender status. *Kadel II* and *Grimm v. Gloucester County School Board*, 972 F.3d 586, 608 (4th Cir. 2020), *amended* (Aug. 28, 2020), are binding here as well. *Grimm* held that classifications based on transgender status trigger heightened scrutiny because transgender people, as a group, satisfy each of the four factors for identifying quasi-suspect classification. *Id.* at 611-14. *Kadel II* reaffirmed *Grimm*, holding that a transgender status classification exists when a restriction bars access to procedures that only transgender people receive. *See* 100 F.4th at 143, 148.

The Orders are even more overt in their transgender status classification than those in *Kadel II* or *Grimm*. The Denial of Care Order explicitly refers to transgender people in describing the prohibited medical care. *See*, *e.g.*, Denial of Care Order § 7(a) (referring to the care as "pediatric *transgender* surgeries or hormone treatments") (emphasis added). And the Order restricts federal funding only if the care is provided to a patient who possesses "an identity that differs from his or her sex." *Id.* § 2(c). To possess an identity that differs from one's sex assigned at birth is the

definition of being transgender.[7]  The Orders go to "the very heart of transgender status" by excluding "treatments aim[ed] at addressing incongruity between sex assigned at birth and gender identity."  *Kadel II*, 100 F.4th at 146; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (observing that the Court has "little trouble concluding that a law excluding" gender dysphoria from protection "would discriminate against transgender people as a class").  As *Kadel II* instructs, prohibiting treatments based on whether they are provided for purposes of "gender transition" expressly targets transgender people.  *See* 100 F.4th at 143-49.

**c)**    **The Executive Orders were issued "because of," not "in spite of," their adverse effect on transgender people.**

Even if the Executive Orders were deemed to be facially neutral, which would be contrary to binding circuit precedent, they would still trigger heightened scrutiny because they were passed at least in part because of, not in spite of, their adverse effects on transgender people and the Trump administration's ideological opposition to gender transition.  *See Kadel II*, 100 F.4th at 168 (Richardson, J., dissenting); *see also*, *e.g.*, *Feeney*, 442 U.S. at 279.

First, the Orders' text makes clear that the Trump Administration intends to restrict the rights of transgender people.  The Gender Identity Order contrasts so-called "gender ideology" or the "false claim that males can identify as and thus become women and vice versa" with the "biological reality" of assigned sex at birth.  Gender Identity Order § 1.  It defines sex as an "immutable biological classification" that "does not include the concept of gender identity."  *Id.* § 2(a).  And the Gender Identity Order asserts that transgender identities are invalid and "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."  *Id.* §§ 2(f)-(g).

---

[7]  *See Transgender*, MERRIAM WEBSTER'S DICTIONARY ("a person whose gender identity differs from the sex the person was identified as having at birth"), https://www.merriam-webster.com/dictionary/transgender.

The Denial of Care Order reflects and implements the Gender Identity Order's ideological opposition to transgender people by seeking to end access to medically necessary care for transgender adolescents and young adults. This objective is evident from the effect and admitted purposes of the restrictions, *see* Gender Identity Order §§ 1, 2(a), (f); Denial of Care Order § 2(c), as well as their tone. Gender affirming medical care is pejoratively called "chemical and surgical mutilation," and described as "maiming and sterilizing" them and "damaging" their "healthy body parts." Denial of Care Order §§ 1, 2(c), 8(d). The Order also draws insulting comparisons between gender affirming medical care and female genital mutilation and also suggests that medical care to treat gender dysphoria is "child abuse." *Id.* §§ 8(a)-(b), (e).

Second, the context surrounding these Orders, including other executive actions during the past two weeks, betrays their underlying animus. For example, another executive order issued on January 27, 2025 deems "adoption of a gender identity inconsistent with an individual's sex" to be in conflict with a "commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[8] The Orders challenged here are thus part of a far-reaching attack on transgender people spearheaded by President Trump, who has issued a litany of Executive Orders during his first two weeks in office that expressly target transgender people.[9] The degree of prejudice is remarkable, and it reinforces the Orders' unconstitutional purposes.

Disapproving of transgender people and enforcing state-mandated gender conformity was not an incidental effect of the Orders; it was its purpose.

---

[8] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[9] Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025); Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, Fed. Reg. 8621 (Jan. 20, 2025); Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

### 2.    The Executive Orders Cannot Survive Heightened Scrutiny.

To survive heightened scrutiny, "the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Kadel II*, 100 F.4th at 156 (internal quotation marks and citation omitted). The Executive Orders assert an interest in "protecting" children. But they do the opposite. First, 18-year-olds are legal adults, but the Denial of Care Order targets their medical care. Second, the Orders harm adolescents and young adults by restricting their access to the only medically necessary treatments for gender dysphoria. The Orders dismiss out of hand the views of every major U.S. medical association, which all publicly support the restricted medical care. *See Dekker v. Weida*, 679 F. Supp. 3d 1271, 1285 (N.D. Fla. 2023).[10] Even if "protecting" adolescents were the Orders' real interest, they do not satisfy it.

The Executive Orders prohibit medical care that "improves the health and well-being of many adolescents with gender dysphoria." *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 918 (E.D. Ark. 2023). There is "no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients." *Dekker*, 679 F. Supp. 3d at 1286. Rather, "denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide." *Id.*

The Orders also fail heightened scrutiny because they are not substantially related to protecting children. Even if gender affirming medical care for transgender adolescents carries risks, as all medical care does, the Orders are both over- and under-inclusive with respect to those

---

[10] The Denial of Care Order calls WPATH an organization "without scientific integrity" and the WPATH Standards "junk science." Denial of Care Order § 3(a). But the Fourth Circuit has recognized the WPATH Standards as the "generally accepted" protocols for gender dysphoria treatment. *See Kadel II*, 100 F.4th at 136; *Kadel v. Folwell*, 12 F.4th 422, 427 (4th Cir. 2021); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019).

purported risks.  They are overinclusive because they restrict access to care for transgender adolescents and young adults nationwide, without exception, no matter what a minor patient's parents, an adult patient's own views, and their doctors' views on the question.  And the Orders do not just target medical treatments for minors, they also target some adults like Plaintiffs Lawrence Loe and Dylan Doe who otherwise have the ability to consent for themselves.  The Orders are also underinclusive because they do not restrict access to the same medications and procedures if the purpose of the procedures is to conform a person's gender presentation or physical appearance to their assigned sex at birth.

### 3.     The Executive Orders fail rational basis review.

Additionally, the Orders fail any level of scrutiny because they are transparently motivated by a "bare desire to harm" transgender people.  *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted).  The text and context of the Orders are "dripping" with animus.  *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 572 (4th Cir.) (en banc), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017).

"[D]isapproving [of] transgender status," "discouraging individuals from pursuing their honest gender identities," and "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex," are "plainly illegitimate purposes" that demonstrate a law was adopted for its "purposeful discrimination against transgender[] [people]."  *Dekker*, 679 F. Supp. 3d at 1292-93; *see also* Order Granting Pls.' Mot. Prelim. Inj. at 33-34, *Van Garderen v. Montana*, No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023).[11]  Such an objective "is not a legitimate state interest."  *Dekker*, 679 F. Supp. 3d at 1292.

---

[11] Available at: https://webservices.courthousenews.com/sites/Data/AppellateOpinionUploads/2023-27-9--11-53-55-transgender%20care.pdf (accessed Feb. 4, 2025).

For all these reasons, Plaintiffs have a likelihood of success on their equal protection claim.

## II.    THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING ORDER.

As other federal courts have already held in issuing TROs against unlawful attempts to withhold federal funding, all the other factors weigh strongly in favor of a TRO. *See New York v. Trump*, 2025 WL 357368, at *3-4; *Nat'l Council of Nonprofits*, 2025 WL 368852, at *14.

### A.    The Executive Orders Already Are Causing Irreparable Harm.

Plaintiffs easily satisfy the irreparable harm factor. The "prospect of an unconstitutional enforcement" alone "supplies the necessary irreparable injury" for emergency relief. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). Plaintiffs have shown a strong likelihood of success on at least three constitutional claims, each of which gives rise to irreparable harm *per se*. *Id.*; *see Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 333 (4th Cir. 2021) (en banc).

The mandated stripping of federal funding to medical institutions that provide gender affirming medical care has also had immediate concrete effects. Transgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether. Families have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients. [12]

The Fourth Circuit has held that acts that "diminish[] access to high-quality health care" cause irreparable harm. *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019); *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013); *see also, e.g.*, *Ass'n of Cmty. Cancer Ctrs. v.*

---

[12] *See* Goe Decl. ¶¶ 13-17; Boe Decl. ¶¶ 13-20; Coe Decl. ¶¶ 16-19; Roe Decl. ¶¶ 10-16; Chapman Decl. ¶¶ 30-34; Loe Decl. ¶¶ 11-14; Doe Decl. ¶¶ 11-15; Bond Decl. ¶ 14; Sheldon Decl. ¶ 29; Birnbaum Decl. ¶¶ 12-13. *See also* E.M. Decl.; M.V. Decl.; Jane Doe 1 Decl.; Jane Doe 2 Decl.; Jane Doe 3 Decl.

*Azar*, 509 F. Supp. 3d 482, 502 (D. Md. 2020) ("*ACCC*"). The Orders have already done that and more: Plaintiffs' access to care has been cut off entirely, not just "diminished." And the lost care is not merely "high-quality," it is the *only* medically accepted course of treatment for thousands of transgender adolescents throughout the country. *See ACCC*, 509 F. Supp. 3d at 502.

**B.    The Public Interest Overwhelmingly Favors Relief.**

The balance of equities and the public interest, which merge when the defendant is the government, *id.* at 501, clearly favor relief. First, "[i]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Indeed, "the government is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011). The threat of a deprivation of constitutional rights "will easily outweigh whatever burden the injunction may impose." *St. Michael's Media*, 566 F. Supp. 3d at 351. Although the public has an interest in enforcement of lawful and constitutionally permissible exercises of executive authority, it does not have an interest in enforcing an unconstitutional and *ultra vires* executive power grab like the Orders here. It is also never in the public interest to single out a minority group for denigration and material deprivation.

**C.    A Nationwide Injunction Is Necessary.**

Only a nationwide injunction can afford Plaintiffs complete relief. The Fourth Circuit has authorized nationwide injunctions against executive orders if a nationwide scope "meet[s] the exigencies of the particular case." *HIAS*, 985 F.3d at 326 (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)); *see ACCC*, 509 F. Supp. 3d at 503 (collecting cases). The exigencies of this case require a nationwide injunction. PFLAG and GLMA have members "throughout the country" who have been harmed by the Executive Orders. *See* Birnbaum Decl. ¶¶ 3, 5, 12-15; Bond Decl. ¶¶ 4, 8; E.M. Decl. ¶ 3; Jane Doe 1 Decl. ¶ 3; Jane Doe 2 Decl. ¶ 3; Sheldon Decl.

¶¶ 9, 29; Koe Decl. ¶ 3; *HIAS*, 985 F.3d at 326–27 (citations omitted); *see Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 932 (2024) (Kavanaugh, J., concurring) (noting that even an injunction limited to plaintiffs may "have widespread effect" if the plaintiff is an "association that has many members").  And because the Orders harm the Transgender Plaintiffs through their coercive impact on third parties, an injunction must necessarily extend to those third parties to provide the necessary relief to all of PFLAG and GLMA's members.  Indeed, President Trump has celebrated the *in terrorem* effect on third parties as evidence that his Orders are "having [their] intended effect."  Gonzalez-Pagan Decl. Ex. A-7.  In these exigent circumstances, no narrower injunction can provide complete relief.

## CONCLUSION

The balance of the four TRO factors weighs in Plaintiffs' favor.  The Court should enter an order temporarily restraining the Agency Defendants from implementing or enforcing Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order from otherwise withholding federal funding based on the fact that a healthcare entity provides gender affirming medical care, including any healthcare institution from which the Transgender Plaintiffs and patients of health professional members of GLMA receive gender affirming medical care.

Date:  February 5, 2025

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union
    Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile:  (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg  (Fed. Bar No. 30727)
**American Civil Liberties Union
    Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Laura J. Edelstein*
Kai N. Galindo**
**Jenner & Block LLP**
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile:  (628) 267-6859
LEdelstein@jenner.com
KGalindo@jenner.com

Madeleine V. Findley**
Zachary B. Cohen (Fed. Bar No. 20159)
Mary-Claire Spurgin**
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

Respectfully submitted,

*/s/ Zachary B. Cohen*

Omar Gonzalez-Pagan**
Jennifer C. Pizer**
**Lambda Legal Defense
    and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile:  (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy**
**Lambda Legal Defense
    and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert**
**Lambda Legal Defense
    and Education Fund, Inc.**
65 E. Wacker Place, Suite 2000
Chicago, IL 60601
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

Catherine E. Stetson***
Danielle Desaulniers Stempel (Fed. Bar No.
20501, Renewed 1/31/25)
Kristina Alekseyeva**
Sam H. Zwingli**
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com

MFindley@jenner.com
MSpurgin@jenner.com

Jocelyn A. Sitton**
Lillian M. McGuire**
Rebecca M. Diamond**
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
JSitton@jenner.com
LMcGuire@jenner.com
RDiamond@jenner.com

sam.zwingli@hoganlovells.com

Jackson Skeen****
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice
granted.*

*\*\* Application for admission pro hac vice
pending.*

*\*\*\*Application for admission or admission pro
hac vice forthcoming.*

*\*\*\*\*Application for admission pro hac vice
pending and admitted only in D.C.  Supervised
by principals of the firm admitted in
Massachusetts.*